IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ADRANIH ERNAY, ADRIAN ERNAY, WENDELL WESLEY, OTIS RAGLAND, and LINDA FAUST, :<br><br>Plaintiffs,<br><br>v.<br><br>CHRIS SWATSKI and JOHN DOES #1 THROUGH #6,<br><br>Defendants. | CIVIL ACTION<br><br>NO. 10-1035 |

**DuBOIS, J.**                                                                                             **July 22, 2011**

**M E M O R A N D U M**

**I.   INTRODUCTION**

This case arises out of the March 18, 2008 search of plaintiffs' apartments by defendant Chris Swatski and six agents of the Pennsylvania Board of Probation and Parole ("PBPP"), identified in the Complaint as John Does #1 through #6. Plaintiffs assert claims under 42 U.S.C. § 1983, alleging violations of their Fourth Amendment rights based on: (1) defendants' entry into and search of their apartments, and (2) defendants Swatski, John Doe #1, and John Doe #2's alleged use of excessive force against plaintiffs Adrian Ernay, Wendell Wesley, and Otis Ragland.

Presently before the Court is Defendant Swatski's Motion for Summary Judgment. Swatski argues that the John Doe defendants should be dismissed and that the motion for

1

summary judgment should be granted as to all claims.  For the reasons that follow, the Court grants Swatski's motion in part and denies it in part.

## II.  BACKGROUND[1]

### A. Investigation and Preparation for Search for Keene

In March 2008, PBPP agent Todd H. Childs performed a fugitive investigation for Jesse James Keene, a parolee who had absconded from a halfway house in Chester, Pennsylvania. (Def.'s Stmt. of Facts ¶¶ 3-4; Pl.'s Stmt. of Facts ¶¶ 3-4.)  Childs prepared a briefing packet, which states that Keene absconded from the halfway house in Chester and that he had a history of "assault" and "escape."  (Def.'s Stmt. of Facts ¶ 6; Pl.'s Stmt. of Facts ¶ 6; Def.'s Mot. for Summ. J., Ex. 1.)  The packet lists Stephanie Leland as Keene's spouse;  lists 1004 Wagontown Road, Coatesville, Pennsylvania as Leland's place of residence; and notes that it is a possible address with which Keene was associated from June 2006 to March 2008.  (Id.; Def.'s Mot. for Summ. J., Ex. 4.)

During a briefing at the PBPP Chester District Office on the morning of March 18, 2008, PBPP agent Patrick R. Oldring distributed copies of the briefing packet to a group of agents, including defendant Swatski, a PBPP supervisor.  (Def.'s Stmt. of Facts ¶¶ 1, 8; Pl.'s Stmt. of Facts ¶¶ 1, 8.)  Swatski gave the packet a "cursory review."  (Swatski Dep. at 111.)

### B. The Search for Keene at 1004 Wagontown Road

A team of PBPP agents arrived at 1004 Wagontown Road shortly before day break on March 18, 2008.  (Def.'s Stmt. of Facts ¶ 10; Pl.'s Stmt. of Facts ¶ 10.)  The building is a duplex with two apartments—Unit A and Unit B.  (Def.'s Stmt. of Facts ¶ 11; Pl.'s Stmt. of Facts ¶ 11.)

---

[1] The following facts are undisputed unless otherwise noted and are presented in the light most favorable to plaintiffs.

Plaintiff Linda Faust resided in Unit A, while plaintiff Adranih Ernay resided in Unit B with her two sons, plaintiffs Wendell Wesley, age 22, and Adrian Ernay, age 18. (Def.'s Stmt. of Facts ¶¶ 12-13; Pl.'s Stmt. of Facts ¶¶ 12-13.) Plaintiff Otis Ragland, age 17, was staying in Unit B as an overnight guest when agents arrived at the property. (Id.)

Viewed facing the front of the house, Unit A is on the left and Unit B is on the right. (Def.'s Stmt. of Facts ¶ 11; Pl.'s Stmt. of Facts ¶ 11.) Each unit has a front door facing a shared front porch and the road. (Id.) Steps along each side of the house lead to a rear side door that leads to a shared laundry room. (Id.) The laundry room itself has two interior doors, each of which opens into the kitchen of each unit. (Id.)

Swatski supervised the search for Keene at 1004 Wagontown Road. (Swatski Dep. at 61-63.) Swatski did not know whether Keene was suspected to be in Unit A or B. (Def.'s Stmt. of Facts ¶ 14; Pl.'s Stmt. of Facts ¶ 14.) Upon arrival at the property, several agents covered the sides and rear of the house, while other agents were stationed on the porch—one group in front of Unit A, and another in front of Unit B. (Id.) Swatski knocked and announced on the door of Unit B, while Oldring and another agent knocked and announced on the door of Unit A. (Def.'s Stmt. of Facts ¶ 15; Pl.'s Stmt. of Facts ¶ 15.)

### C.   Agents' First Entry Into Unit A

Upon hearing the agents' knocks, Faust opened the door to Unit A. (Def.'s Stmt. of Facts ¶ 16; Pl.'s Stmt. of Facts ¶ 16.) Agents asked Faust whether she was Leland. (Faust Dep. at 84.) Faust asserts that, without asking for permission to enter her apartment, two or three agents then walked through the doorway, forcing her to step backwards into her apartment. (Id. at 60-62, 84.) The agents showed her a photo of Keene and asked whether she knew him. (Id. at 60-61,

3

63.) One of the agents also asked who lived in Unit B. (Faust Dep. at 66.) Faust replied that her cousin, Adranih Ernay, lived in Unit B. (Id.)

### D. Agents' Second Entry Into Unit A

Agents then proceeded to knock on the door of Unit B. (Id. at 67-69.) Faust stepped outside onto the porch, warning agents not to knock on the door because doing so might frighten Adranih Ernay. (Id.) Faust stated that she would try to wake Adranih Ernay by knocking on the interior door connecting the shared laundry room to Unit B. (Id. at 69-70.) Three or four agents followed Faust through her apartment to the laundry room. (Def.'s Stmt. of Facts ¶ 19; Pl.'s Stmt. of Facts ¶ 19.) Faust contends that she never consented to the agents' second entry into her home. (Faust Dep. at 129-30.)

During the agents' first and second entries into Unit A, Swatski remained on the porch in front of Unit B. (Def.'s Stmt. of Facts ¶ 20; Pl.'s Stmt. of Facts ¶ 20.) Swatski observed the agents' entries into Unit A, although he asserts that he could not hear any of the conversation between Faust and the agents. (Swatski Dep. at 76-83.)

### E. Agents' Entry Into Unit B

Once inside the laundry room, Faust knocked on the door to Unit B while calling out Adranih Ernay's name. (Def.'s Stmt. of Facts ¶ 23; Pl.'s Stmt. of Facts ¶ 23.) Adranih Ernay woke up, entered the kitchen, saw Faust and two male agents through the window of the kitchen door, and opened the door connecting her kitchen to the laundry room. (Adranih Ernay Dep. at 27-28; Def.'s Stmt. of Facts ¶ 24.) According to plaintiffs, Faust, the two male agents, and several other agents entered the kitchen. (Adranih Ernay Dep. at 28; Faust Dep. at 89.)

Upon entering the kitchen, the agents showed Adranih Ernay a photo of Keene. (Def.'s Stmt. of Facts ¶ 26; Pl.'s Stmt. of Facts ¶ 26.) Adranih Ernay was not wearing her glasses at the time. (Adranih Ernay Dep. at 32.) Upon first seeing Keene's photo, Adranih Ernay screamed, put her hands to her cheeks, and shouted, "I put him out last night. His stuff is downstairs." (Def.'s Stmt. of Facts ¶ 27; Pl.'s Stmt. of Facts ¶ 27.) At that point, agents began searching Unit B. (Def.'s Stmt. of Facts ¶ 28; Pl.'s Stmt. of Facts ¶ 28.) Upon hearing Adranih Ernay's screams, plaintiffs Wesley, Adrian Ernay, and Ragland rushed out of their bedrooms to the top of the stairway. (Def.'s Stmt. of Facts ¶ 29; Pl.'s Stmt. of Facts ¶ 29.) Agents drew their firearms and pointed them at Wesley, Adrian Ernay, and Ragland, ordering the three to come downstairs with their hands in clear view. (Def.'s Stmt. of Facts ¶ 30; Pl.'s Stmt. of Facts ¶ 30.) Wesley and Ragland complied, while Adrian Ernay refused to show his hands and cursed at the agents. (Def.'s Stmt. of Facts ¶ 31; Pl.'s Stmt. of Facts ¶ 31.) Adrian Ernay demanded to know who the agents were, asked to see a warrant, and ordered them to leave the apartment. (Id.)

Realizing that she did not have her glasses on, Adranih Ernay went to the bedroom to retrieve them, returned to the kitchen, and again examined the photo of Keene. (Def.'s Stmt. of Facts ¶ 32; Pl.'s Stmt. of Facts ¶ 32.) After viewing the photo, Adranih Ernay informed the agents that the photo was not of her boyfriend Byron—whom she had thrown out of the apartment the night before. (Id.; Adranih Ernay Dep. at 104.) Adranih Ernay apologized, and the agents holstered their guns. (Def.'s Stmt. of Facts ¶ 32; Pl.'s Stmt. of Facts ¶ 32.)

F.   **Swatski's Entry Into Unit B**

After following Faust from the laundry room to the kitchen of Unit B, one of the agents radioed an unspecified agent or agents outside, notifying them that the agents had gained entry into Unit B. (Def.'s Stmt. of Facts ¶ 25; Pl.'s Stmt. of Facts ¶ 25.) At about the same time, an agent inside the laundry room opened the exterior door leading from the laundry room to the side of Unit B. (Id.) One of the agents outside heard that agents had entered Unit B, and told Swatski, "they're in." (Def.'s Stmt. of Facts ¶ 33; Pl.'s Stmt. of Facts ¶ 33.) Swatski, accompanied by at least one other agent, walked up the right side of Unit B and entered the open door near the back of the apartment. (Id.)

Upon entering, Swatski observed that one of the female plaintiffs was upset and crying. (Swatski Dep. at 90.) He also saw two males on the stairway with their hands in the air, and a number of agents at the bottom of the stairway. (Def.'s Stmt. of Facts ¶ 35; Pl.'s Stmt. of Facts ¶ 35; Swatski Dep. at 96.) Swatski asserts that he never saw any weapons drawn. (Swatski Dep. at 100.) He nevertheless did not find it unusual to see the two males with their hands raised because "[i]t's not uncommon, if you encounter an unknown possible threat, to give verbal commands to see their hands." (Id.) After hearing agents say "it's clear," Swatski spoke with one of the female plaintiffs in the kitchen, gave her his business card, apologized and thanked her, and told her to contact him if she had any information about Keene. (Swatski Dep. at 101; Def.'s Stmt. of Facts ¶ 36; Pl.'s Stmt. of Facts ¶ 36.)

All agents left the property by daybreak. (Def.'s Stmt. of Facts ¶ 38; Pl.'s Stmt. of Facts ¶ 38.)

### G.  The Present Litigation

Plaintiffs filed the Complaint in this case on March 9, 2010.  The Complaint alleges three counts:  Counts I and II are claims for unreasonable search and seizure brought by all plaintiffs against all defendants, and Count III is an excessive use of force claim brought by Adrian Ernay, Wesley, and Ragland against Swatski, John Doe #1, and John Doe #2.

Swatski filed the present motion for summary judgment on April 5, 2011.  In the motion, Swatski argues that the John Doe defendants should be dismissed and that his motion for summary judgment should be granted as to all claims.

### III.  LEGAL STANDARD

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).  The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim.  Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).  After examining the evidence of record, a court should grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

## IV. DISCUSSION

Swatski raises a number of arguments in his motion for summary judgment. First, he argues that the John Doe defendants should be dismissed. Second, he contends that the doctrine of qualified immunity bars plaintiffs' claims against him. Third, he argues that the motion should be granted on plaintiffs' claims for unreasonable search and seizure and excessive use of force. The Court addresses each issue in turn.

### A. The John Doe Defendants

Swatski argues that the John Doe defendants should be dismissed pursuant to Federal Rule of Civil Procedure 21, as plaintiffs have known the identities of the John Doe defendants for eight months and have failed to amend the Complaint to name any John Does. Plaintiffs concede that all claims against the John Doe defendants should be dismissed. (Pls.' Resp. to Def.'s Mot. for Summ. J. ¶ 12.) Thus, Swatski's motion for summary judgment is granted as to the claims against John Does #1 through #6.

### B. Law on Qualified Immunity

The doctrine of qualified immunity provides that government officials are immune from suits for civil damages under 42 U.S.C. § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Because qualified immunity shields officials from liability "when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), the doctrine applies "regardless of whether the government official's conduct results

from a mistake of law, mistake of fact, or mistake based on mixed questions of law and fact." Montanez v. Thompson, 603 F.3d 243, 250 (3d Cir. 2010) (citing Pearson, 555 at 231).

Determining whether a defendant is entitled to qualified immunity requires two inquiries, which can be taken in either order. Pearson, 555 U.S. at 236. The first is "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." Id. at 232 (internal citations omitted). The second is "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id.

The first inquiry focuses on whether there was a reasonable mistake of fact—that is, "an officer's misperception of the circumstances by which he is surrounded." Southerland v. Pennsylvania, 389 F. App'x 166, 170 (3d Cir. 2010). The second inquiry focuses on whether the government official committed a reasonable mistake of law. For purposes of this latter inquiry, a right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Reedy v. Evanson, 615 F.3d 197, 224 (3d Cir. 2010) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Pearson, 555 U.S. at 244 (internal quotation marks omitted).

In the remainder of this Memorandum, the Court addresses Swatski's qualified immunity arguments as they pertain to plaintiffs' claims for unreasonable search and seizure and use of excessive of force.

### C. Unreasonable Search and Seizure Claims

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few

specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (internal citations omitted); accord Payton v. New York, 445 U.S. 573, 586 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." (citation omitted)).  The parties do not dispute that the PBPP did not have a search warrant for 1004 Wagontown Road.  Swatski argues, however, that a number of exceptions to the warrant requirement apply in this case: consent, exigent circumstances, a law enforcement officer's reasonable belief that a parole absconder is in a residence, and the community caretaking exception.

Swatski entered and searched Unit B, but never entered Unit A of 1004 Wagontown Road.  If none of the exceptions to the warrant requirement apply, Swatski faces only supervisory liability for his agents' entry into Unit A, but both supervisory and direct liability for his agents' and his own entry into and search of Unit B.  As supervisor of the search, Swatski is liable only if he participated in violating plaintiffs' rights, directed others to violate their rights, or if he had knowledge of and acquiesced in his subordinates' violations.  See Reedy v. Evanson, 615 F.3d 197, 231 (3d Cir. 2010) (citing Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995)).  With this in mind, the Court turns to each of the exceptions to the warrant requirement raised in Swatski's motion for summary judgment.

    *1.*    *Consent*

One established exception to the warrant requirement is a search or seizure conducted pursuant to voluntary consent.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  For consent to be voluntary, it cannot be "the product of duress or coercion, express or implied . . . ." Id. at 227.  Consent is a question of fact determined from the totality of the circumstances

surrounding the exchange through which consent was allegedly obtained. United States v. Antoon, 933 F.2d 200, 203 (3d Cir. 1991). Among the factors to be considered are "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions." United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009) (internal citations omitted).

Swatski argues that whether the agents he supervised actually obtained plaintiffs' consent to enter Units A and B is immaterial; rather, the question is whether it was objectively reasonable for him to believe—based on his observations that, for example, Faust appeared to be cooperating with agents and that other agents had entered the two apartments—his subordinates had obtained plaintiffs' consent to enter and search the apartments. This argument is unavailing. Contrary to Swatski's assertion, the consent exception to the warrant requirement applies only if consent to enter and search the premises was in fact given. Whether it was reasonable for Swatski to believe plaintiffs had actually consented goes only to the question whether he committed a reasonable mistake of fact, for which he is entitled to qualified immunity.

The record is conflicting as to, inter alia, whether any of the plaintiffs consented to the PBPP agents' search of their apartments; whether Swatski could hear the conversation between Faust and other PBPP agents while he stood on the porch in front of Unit B; and what Swatski knew or should have known about whether plaintiffs actually consented to the PBPP agents' search. These genuine issues of material fact preclude a determination at this juncture of the applicability of the qualified immunity doctrine and the consent exception to the warrant requirement.[2] Thus, the motion for summary judgment is not granted on this ground.

---

[2] Swatski argues that if Adranih Ernay did consent to the agents' entry into and search of Unit B, the fact that Adrian Ernay subsequently ordered the agents to leave did not effect a withdrawal of consent because Adrian Ernay was not the head of household. Having concluded

## 2. *Exigent Circumstances*

Another established exception to the warrant requirement is the existence of exigent circumstances.  Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006).  "Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others."  United States v. Coles, 437 F.3d 361, 366 (3d Cir. 2006).  The exigent circumstances exception does not apply when the exigency is "created or manufactured by the conduct of the police."  Kentucky v. King, 131 S. Ct. 1849, 1857 (2011) (internal quotation marks omitted).  Rather, the doctrine applies only "when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment."  Id. at 1862.

Swatski asserts that an exigency arose when, upon first viewing Keene's photo, Adranih Ernay screamed, put her hands to her cheeks, and shouted, "I put him out last night.  His stuff is downstairs."  Swatski argues that Adranih Ernay's reaction to Keene's photo reasonably could have led agents to believe Keene was inside the residence.  As an initial matter, Adranih Ernay's scream cannot justify the agents' warrantless entry into Unit B; Adranih Ernay screamed only after the agents had already entered Unit B without a warrant.

With respect to the agents' search of Unit B following Adranih Ernay's scream, the lawfulness of that search requires a determination of two issues.  The first is whether it was reasonable for the agents to believe, based on Adranih Ernay's reaction to Keene's photo, that Keene was in the apartment.  This is a question to be resolved by the trier of fact.  The second issue is whether Adranih Ernay consented to the agents' entry into her apartment before she was

---

that there are genuine issues of material fact concerning whether Adranih Ernay ever consented to the agents' entry in the first instance, the Court need not address Swatski's argument.

shown the photo of Keene.  See Id. (exigent circumstances exception applies only "when the police do not gain entry to premises by means of a[] [Fourth Amendment] violation").  Because there is a genuine issue of material fact as to whether Adranih Ernay consented to the agents' initial entry into her apartment, the Court concludes that the applicability of the exigent circumstances exception cannot be resolved at this stage of the proceedings.  See Coles, 437 F.3d at 366 ("The presence of exigent circumstances is a finding of fact . . . .").  Accordingly, the motion for summary judgment is not granted on this ground.

                3.        *Reasonable Belief That a Parole Absconder is in a Residence*

A law enforcement officer in possession of an arrest warrant may enter a residence when he has "a reasonable belief the arrestee (1) lived in the residence, and (2) is within the residence at the time of entry."  United States v. Veal, 453 F.3d 164, 167 (3d Cir. 2006) (internal quotation marks omitted); see Payton v. New York, 445 U.S. 573, 603 (1980).  Under Pennsylvania law, a parole agent may "arrest without warrant . . . any parolee . . . for failing to report as required by the terms of his . . . parole or for any other violation of . . . parole."  61 Pa. C.S.A. § 6152; see Ulitchney v. Ruzicki, 412 F. App'x 447, 450-51 (3d Cir. 2011).

Because Keene absconded from the Chester halfway house, PBPP agents had the authority to arrest him without a warrant.  However, they could enter plaintiffs' homes in search of him only if they reasonably believed he lived at 1004 Wagontown Road and was present in the duplex on the morning of March 18, 2008.  Determining whether Swatski and his subordinates' belief was reasonable requires resolving genuine issues of material fact, such as the extent of the PBPP's investigation into Keene's whereabouts and their surveillance of 1004

Wagontown Road prior to March 18, 2008. In light of these genuine issues of material fact, the motion for summary judgment is not granted on this ground.

### 4. *Community Caretaking Exception*

Police may conduct warrantless searches when they "engage in what, for want of a better term, may be described as community caretaking functions." Cady v. Dombrowski, 413 U.S. 433, 441, 447-48 (1973). "In performing [their] community caretaking role, police are 'expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing and provide an infinite variety of services to preserve and protect public safety.'" United States v. Smith, 522 F.3d 305, 313 (3d Cir. 2008) (citation omitted).

The community caretaking exception is inapplicable to the case at bar. The Supreme Court has made clear that the doctrine is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady, 413 U.S. at 441. In searching for Keene, the PBPP agents were engaged in the investigation of a crime—namely, Keene's absconding from the Chester halfway house. As such, they cannot be said to have been engaged in a community caretaking function when they entered and searched plaintiffs' apartments. For this reason, the Court concludes that the community caretaking exception does not serve as a ground for granting the motion for summary judgment.

### D. **Excessive Use of Force Claim**

Swatski next argues that he is entitled to summary judgment on Adrian Ernay, Wesley, and Ragland's excessive use of force claim.

The Fourth Amendment bars government officials from using excessive force in effectuating an arrest. Estate of Smith v. Marasco, 318 F.3d 497, 515 (3d Cir. 2003). "The test

of reasonableness under the Fourth Amendment is whether, under the totality of the circumstances, the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Id. (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).  This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 397. Furthermore, the officers' conduct should be evaluated from the officers' vantage point at the time of the incident. Id. at 396-97.  "Police officers are often forced to make split-second judgements—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id.

Adrian Ernay, Wesley, and Ragland contend that John Does #1 and #2 used excessive force when they trained their guns on them.  Pointing a gun may constitute excessive force. See Couden v. Duffy, 446 F.3d 483, 495 n.8 (3d Cir. 2006); Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995).  Because Swatski himself did not brandish a weapon, he faces only supervisory liability for the actions of John Doe #1, John Doe #2, and any other agents who may have pointed their guns at the three men.[3]  As supervisor, Swatski is liable only if he had knowledge of and acquiesced in his subordinates' use of excessive force. See Reedy v. Evanson, 615 F.3d 197, 231 (3d Cir. 2010).

There is no evidence that the agents used excessive force.  It was entirely reasonable for the agents to draw their weapons at the sight of three men suddenly bounding down the stairs.

---

[3] Wesley testified at his deposition that more than two PBPP agents pointed their guns at the three men.  (Wesley Dep. at 67.)

The agents holstered their guns as soon as it became clear that Adranih Ernay had mistakenly identified the photo of Keene as a photo of her boyfriend, and plaintiffs have failed to cite to any evidence showing how long the agents pointed their weapons at Adrian Ernay, Wesley, and Ragland.  Under these circumstances, the Court grants Swatski's motion for summary judgment as to Adrian Ernay, Wesley, and Ragland's claim for excessive use of force.

## V.  CONCLUSION

For the foregoing reasons, Defendant Swatski's Motion for Summary Judgment is granted in part and denied in part.  The motion is granted as to plaintiffs' claims against the John Doe defendants and Adrian Ernay, Wesley, and Ragland's claim of excessive use of force.  The motion is denied in all other respects.  An appropriate order follows.